UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| YSAURA MEZON, individually and as parent of O.M.; LUCIA MEJIA, individually and as parent of E.V.; MARIA PIRIR, individually and as parent of M.P.; JUAN CRUZ ESTEVEZ, individually and as parent of Y.T.; on behalf of themselves and all others similarly situated, | : : : : : : | |
| *Plaintiffs*, | : : | |
| v. | : | 1:24-cv-00161-JJM-LDA |
| | : | |
| PROVIDENCE PUBLIC SCHOOL DEPARTMENT; PROVIDENCE PUBLIC SCHOOL BOARD; RHODE ISLAND DEPARTMENT OF EDUCATION; and ANGÉLICA INFANTE-GREEN, Commissioner of Education, | : : : : : : | |
| *Defendants* | : | |

**THE MEMORANDUM IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS RHODE ISLAND DEPARTMENT OF EDUCATION, ITS COMMISSIONER AND THE PROVIDENCE PUBLIC SCHOOL DEPARTMENT**

Defendants, RHODE ISLAND DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION ("RIDE"), ANGÉLICA INFANTE-GREEN, in her official capacity as Commissioner of Education (the "Commissioner") and the PROVIDENCE PUBLIC SCHOOL DEPARTMENT ("PPSD" or the "District" and collectively, the "Defendants"), jointly submit the following in support of their motion for summary judgment on the ground that there is "no genuine issue as to any material fact" and Defendants are entitled to judgment "as a matter of law" pursuant to Fed.R.Civ.P. 56(c).

# I. INTRODUCTION AND SUMMARY OF ARGUMENT[1]

The case should be dismissed pursuant to the doctrine of administrative exhaustion. Plaintiffs' claim that "they have no other avenue to change the PPSD/RIDE decision to close the school" other than "a petition to this Court," *see* Complaint, ¶ 84 at p. 32, is belied by R.I. Gen. Laws § 16-39-1, which provides a right to an evidentiary hearing before a RIDE Hearing Officer to any party "having any matter of dispute between them arising under any law relating to schools or education." *Id.* (Discussed *infra* at pp. 25-27).   Even if one were to assume, for argument's sake, that the doctrine of administrative exhaustion was not applicable, Defendants' motion for summary judgment should nonetheless be granted and the Complaint dismissed.

In the first sentence of their Complaint, Plaintiffs make the first of several patently erroneous claims when they state: "This case is a direct descendant of the U.S. Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954)."  Complaint, ¶ 1 at p. 1.[2]  In *Brown*, of course, the Court held that segregation of children in public schools solely on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment.  *See* 347 U.S. at 495. By ironic contrast with the plaintiffs in *Brown*, Plaintiffs here seek to remain segregated in a failing school, and for obvious reasons they stay clear of any claim based upon the Equal Protection Clause. Although Plaintiffs may not agree with PPSD's decision to effectively merge

---

[1] Throughout this memo the term English language learner ("ELL") and multi-lingual learner ("MLL") will be used interchangeably and both refer to a student:

    (1)  whose first language is not English or who speaks a variety of English, as used in a foreign country or U.S. possession, that is so distinct that ELL instruction is necessary,

    (2)  who is now learning English, but

    (3)  who has not yet attained enough proficiency in English to allow him or her to fully profit from content area instruction conducted only in English.

*See* Council on Elementary and Secondary Education's (the "Ed. Council's") *Regulations Governing the Education of English Language Learners* (the "MLL Regs."), 200-RICR-20-30-3.2(A)(1).

[2] As will be discussed, Plaintiffs have misstated relevant assessment, absenteeism and SurveyWorks data, the percentage of MLL students attending 360, as well as teacher attendance rates, *see* Complaint, ¶¶ 8, 62-65, 76, 78, and have falsely implied that 360 students would be forced to enroll in the Juanita Sanchez Educational Complex, *see id.*, ¶ 68, and that PPSD is in violation of its 2018 Settlement Agreement with the Department of Justice ("DOJ").  *See id.*, ¶¶ 5 and 57.

360 High School ("360") with the Juanita Sanchez Educational Complex ("JSEC") to create a re-designed Juanita Sanchez Life Sciences Institute ("JSLSI"), they apparently are aware that there is no way they could prove either that the decision will result in disparate impact upon MLLs, or that it was the result of intentional discrimination by the Defendants, an inability which would be fatal to any Equal Protection claim.  As a result, Plaintiffs rely entirely upon the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C.A. §§ 1701 *et seq.*

However, it is apparent that Plaintiffs cannot satisfy the very first element of a prima facie case under the EEOA.  As the Court held in *Issa v. School District of Lancaster*, 847 F.3d 121 (2017) – the very EEOA case Plaintiffs cite in their Complaint – that would require proving that the decision was not "informed by an educational theory recognized as sound by some experts in the field."  *Id.* at 135.  Yet, Plaintiffs have not even attempted to address the educational theory supporting the challenged decision in their Complaint, thus ignoring the three-part test announced in *Castaneda v. Pickard,* 648 F.2d 989, 1009 (5th Cir. 1981), the seminal case under the EEOA.  (Discussed *infra* at pp. 31-35).  Instead, Plaintiffs rely upon a series of unsupported generalizations and speculation, coupled with the individual stories of eight students, stories which, while compelling, do not address the issues required in the applicable test.

By contrast, Defendants here support the challenged decision with the affidavit of a qualified expert who makes clear that the decision satisfies the "good cause" standard for school closings under state law, *see* R.I. Gen. Laws § 16-2-15, and that the educational theories and principles upon which both PPSD's Redesign Model for its high schools and the challenged decision were based were sound and reasonably calculated to achieve the desired educational objectives.  (*See* the supporting affidavit of RIDE Deputy Commissioner Dr. Kelvin Roldán Aff.

3

(the "Roldán Aff."), ¶ 51 at p. 20; *see also* the supporting affidavit of PPSD Deputy

Superintendent of Operations Zachary Scott (the "Scott Aff."), ¶ 9 at p. 3 (decision will result in

a cost savings of $1.5 – $2 million).

Indeed, in almost every single EEOA case involving a school, the Court went to great

pains to emphasize that "'Congress intended to leave state and local educational authorities a

substantial amount of latitude in choosing the programs and techniques they would use to meet

their obligations under the EEOA.'" *Horne v. Flores*, 557 U.S. 433, 440-441 (2009) (quoting

*Castaneda*, *supra*, 648 F.2d at 1009 (cases collected *infra* at pp. 33-34). Thus, courts interpreting

the EEOA have universally affirmed the oft-repeated statement of the Supreme Court that that

"[n]o single tradition in public education is more deeply rooted than local control over the

operation of schools." *Milliken v. Bradley*, 418 U.S. 717, 741 (1974).

In addition, as will be discussed, Plaintiffs' action is premature, and their alleged

damages are entirely speculative and do not support a claim for injunctive relief. (Discussed

*infra* at pp. 36-38).

Finally, this is not a typical school closing case and the risks usually associated with

school closings simply do not apply. *See, e.g.,* Nicole Steele Garnett, *Disparate Impact, School

Closures and Parental Choice*, 2014 U.Chi.Legal Forum 289 (2014). After all, the building

where 360 is presently located will not be closed and will continue to be used as a high school.

Thus, an important community institution will remain in the neighborhood, there will be no

disinvestment in the community and no danger of increasing the risk of physical blight in the

neighborhood. *See id*. at 316-317.

## II. FACTS[3]

### A.     The State Intervention under the Crowley Act

1.     In June of 2019 the Johns Hopkins School of Education's Institute for Education Policy released a report on the state of the public schools in Providence and concluded that:

> a.  PPSD had an exceptionally low level of academic instruction, including a lack of quality curriculum and alignment both within schools and across the district.
> b.  School culture was broken, and safety was a daily concern for students and teachers.
> c.  Beyond these safety concerns, teachers do not feel supported.
> d.  School leaders are not set up for success.
> e.  Parents are marginalized and demoralized.

*Id.* at 2-3. A copy of the Report is attached to the Roldán Aff. as Exhibit B.

2.     In the wake of the Hopkins Report, and after years of unsuccessful intervention by RIDE, the State intervened under the *Paul W. Crowley Rhode Island Student Investment Initiative* (the "Crowley Act"), R.I. Gen. Laws § 16-7.1- 5, which provides, in pertinent part, that "[i]f after a three (3) year period of support:"

> . . . there has not been improvement in the education of students as determined by objective criteria to be developed by the [Council], then there shall be progressive levels of control by the department of elementary and secondary education over the school and/or district budget, program, and/or personnel. This control by the department of elementary and secondary education may be exercised in collaboration with the school district and the municipality. If further needed, the school shall be reconstituted. Reconstitution responsibility is delegated to the [Council] and may range from restructuring the school's governance, budget, program, personnel, and/or may include decisions regarding the continued operation of the school. The [Council] shall assess the district's capacity and may recommend the provision of additional district, municipal and/or state resources. If a school or school district is under the [Council's] control as a result of actions taken by the [Council] pursuant to this section, the local school committee shall be responsible for funding that school or school district at the same level as in the prior academic year increased by the same percentage as the state total of school aid is increased.

---

[3] All the facts recited are taken verbatim from the Roldán Aff., but for the facts relating to finances, at ¶¶ 21-26, 42 *infra* at pp. 10-12, 21, which are taken verbatim from the Scott Aff., and are being repeated here merely for the convenience of the Court.  Dr. Roldán's curriculum vitae is attached to his affidavit as Exhibit A.

R.I. Gen. Laws § 16-7.1-5.

3.      On July 23, 2019, the Council on Elementary and Secondary Education (the

"Ed. Council"), delegated to the Commissioner:

> ... the Council's power and authority to take actions consistent with, and in furtherance of, RIDE's intervention in and support of the Providence Public School District, which would include, but not be limited to, assuming control of the District, the reconstitution of the Providence Public Schools and any other power (at law and in equity) available to the Council as may be authorized by law and as may be determined to be necessary and appropriate by the Commissioner.

*See* Minutes of the Ed. Council's July 23, 2019 meeting attached to the Roldán Aff. as Exhibit C.

4.      Following a show cause hearing, the Commissioner found on October 15, 2019

that "there had not been improvement in the education of students in the PPSD as determined by

objective criteria" after the three (3) year period specified in the Crowley Act, and thus entered

an Order of Control and Reconstitution, which provided, in pertinent part, as follows:

> The Commissioner shall control the budget, program, and personnel of PPSD and its schools and, if further needed, the Commissioner shall reconstitute PPSD schools, which may include restructuring the individual school's governance, budget, program, personnel and/or decisions related to the continued operation of the school. The Commissioner shall exercise all the powers and authorities delegated by the Council to the Commissioner and all powers of RIDE over the budget, program and personnel of PPSD and over the individual school's governance. The Commissioner shall also have all powers and authorities currently exercised by the Providence School Board and Superintendent (Acting, Interim or Permanent), as well as all powers and authorities of the Mayor of Providence, and the Providence City Council as it pertains to PPSD and its schools.

*See* October 15, 2019 Order of Control and Reconstitution, a copy of which is attached to the

Roldán Aff.  as Exhibit D.

5.      On November 1, 2019, the Commissioner then entered into a Collaboration

Agreement with the Mayor of Providence, Jorge 0. Elorza, which provided, in pertinent part,

that:

> As set forth in the October 15, 2019 Order and consistent with the Crowley Act, RIDE has assumed full managerial and operational control and responsibility over PPSD's budget, program and personnel. RIDE, through the Commissioner and the City, through its Mayor hereby agree to collaborate in RIDE's exercise of control over PPSD's budget, program and personnel, and its schools.

*See* the Collaboration Agreement, a copy of which is attached to the Roldán Aff. as Exhibit E, § 1(A) at p. 3.

6.     On April 29, 2020, the Commissioner entered an order with respect to the authority of the Providence School Board (the "PSB"), which provided, in pertinent part, as follows:

> The PSB shall continue to serve in an advisory role on matters related to PPSD's budget, program, and personnel decisions; [and]
>
> The PSB will continue to issue any statements of cause and/or conduct hearings required under the Teachers' Tenure and School Administrators' Rights Acts, and take necessary action incident thereto, provided, however, that such action shall not be legally effective unless and until adopted by the Commissioner, in writing . . .

*See* the Commissioner's Order 20-002 re the Providence School Board, a copy of which is attached to the Roldán Aff. as Exhibit F, §§ 2-3 at p. 2.

**B.     The Decision to Merge 360 and JSEC and Create the JSLSI**

7.     The decision by the PPSD Superintendent, Dr. Javier Montañez, to merge 360 High School ("360") with the Juanita Sanchez Educational Complex ("JSEC") to create a re-designed Juanita Sanchez Life Sciences Institute ("JSLSI"), was made after a careful examination of 360's current and historical assessment data, the needs of 360's students, coupled with available economic resources and compatibility with existing redesign plans for the District's high schools. The decision was then reviewed by the Commissioner and her team at RIDE and approved.

8.      As of October 1, 2022, there were 335 students enrolled in 360 in grades 9 through 12 with the following percentages of economically disadvantaged, MLL and differently abled students:

| Economically Disadvantaged Students | | Multilingual Learners | | Differently Abled Students | |
|---|---|---|---|---|---|
| School | State | School | State | School | State |
| 81.8% | 46.1% | 48.1% | 12.5% | 13.4% | 16.7% |

9.      Although there were 161 MLLs enrolled at 360 across all grade levels as of October 1, 2022, 360 does not have the highest MLL concentration in the district.  Three other schools, all undergoing redesign, have similar concentrations.[4] However, in 2022-2023 just 6% of 360's MLL students met their annual growth targets on the ACCESS assessment.

10.      Of the 36 individuals working at 360 in 2022-2023, 28 are teachers, 6 are support professionals, and 2 are administrators. 14% of the teachers are inexperienced, 7% are working out of their primary field and 7% are using an emergency certification.

11.      In accordance with Rhode Island's Every Student Succeeds Act ("ESSA") State Plan, schools that have been identified for Comprehensive Support and Improvement ("CSI")[5] and have failed to meet exit criteria within four years of identification must undergo a school redesign process.  360 was identified for CSI in the 2019-e20 school year and all the relevant data suggests that it will be unlikely to be able to exit CSI status when they are eligible to do so in 2024-2025.

12.      PPSD's decision to recommend the restructuring of 360 to create the JSLSI prioritized expanding access to innovative and engaging programming for in-demand, high-paying fields.  JSEC is undergoing redesign along with Hope, Jorge Alvarez, and Mount Pleasant

---

[4] 360 was tied with four other PPSD high schools (Central High School, Jorge Alvarez High School and JSEC, as well as with Spaziano Elementary School). Four elementary schools had still higher concentrations of MLLs.
[5] CSI schools are those in the lowest 5% in student performance in the State.

High Schools, as well as the DelSesto Middle School, and with these redesign plans, all PPSD high schools have strategies for long-term success in place. (Discussed at ¶¶ 44-54, *infra* at pp. 21-24).

13.    The re-designed JSEC, which will next year be known as the Juanita Sanchez Life Sciences Institute ("JSLSI"), will allow the school community to leverage the state's focus and investments in growing the life sciences to create a hub that will place PPSD at the forefront of education innovation in the state while promoting academic excellence.

14.    The merger will not entail the closure of any school building. Both 360 and JSEC are currently co-located within a single building and will remain in the same building after they merge into the JSLSI.

15.    Contrary to Plaintiff's inference, *see* Complaint, ¶ 68 at p. 28, 360 students will be treated as any other PPSD high school with respect to their choice of what high school they want to attend.

   **i.    360's Chronic Underperformance**

16.    As noted, PPSD closely reviewed 360's performance data to make the recommendation for restructuring.  360's concerning measures on the SAT included:

- 0% math proficiency and 6.7% English language arts ("ELA") proficiency in SY 2022-2023 (all high schools with lower or similar rates are undergoing redesign);
- 1.4% math proficiency and 21.1% ELA proficiency in SY 2021-2022 and 0% math proficiency 14.3% ELA proficiency in SY 2020-2021.

17.    The above figures reflect a significant (12.9%) decrease in ELA proficiency from 2021-22 to 2022-23.  In addition, 360's math proficiency has stagnated across the three school years. *See* 360's math and ELA performance data, respectively attached to the Roldán Aff. as Exhibits G and H.

18.     360 had a 75% four-year graduation rate for SY 2021-2022, and a 74.4% four-year graduation rate for MLLs (again, all high schools with lower or similar rates are undergoing redesign). By contrast, JSEC's four-year graduation rate in 2021-2022 was 82.7% and 83.3% for MLLs.   In addition, 360 had a 16.2% drop-out rate and 17.9% drop-out rate for MLLs in SY 2021-2022. *See* Exhibit I to the Roldán Aff..

19.     Additionally, 360:

- has no accreditation from the New England Association of Schools and Colleges;
- offers no Advanced Placement ("AP") classes;
- has no approved Career & Technical Education (CTE) offerings;
- had only 4.4% of students earning dual or concurrent enrollment college credits in SY 2022-2023;
- had a postsecondary enrollment rate of 37.9% for 2021-2022 graduates, which is below the Districtwide average, and had the lowest postsecondary success index ranking of any high school in the entire state; and
- had a 49.4% chronic absenteeism rate in SY 2022-2023 in a comparatively small school environment.

20.     Moreover, U.S. News & World Report has ranked JSEC higher (39) than 360 (which is then 44-58 dead last grouping).[6]

### ii. Cost Savings

21.     PPSD's primary funding comes through its local budget, which is comprised of funds from the state and funds from the City of Providence, and:

a.     aid from the City of Providence has been nearly flat over the past decade (average annual increase of 0.4%), making it difficult to keep up with cost-of-living changes. Moreover, the District is required to pass through any City aid to Charter schools serving PPSD students, which has increased significantly over the past few years; and

b.     aid from the State is based on per pupil enrollment and has increased over time, but the per pupil state aid does not adequately cover certain specialized programming. For example, the costs to operate a typical special education

---

[6] *See* https://www.usnews.com/education/best-high-schools/rhode-island/rankings.

pre-k classroom are typically 3 times as much as the state aid provided by the students in the classroom.

22.      In addition to the above factors, the expiration of millions in federal COVID-19 relief funds, declining enrollment, an unprecedented growth in the needs of specialized student services and associated costs, have all caused significant financial pressures on PPSD's FY25 budget outlook.

23.      The Crowley Act provides in clear, unambiguous language that a municipality must fund a school district subject to intervention "at the same level as in the prior academic year increased by the same percentage as the state total of school aid is increased." R.I. Gen. Laws § 16-7.1-5(a) (emphasis added).  Yet, in each and every fiscal year ("FY") since PPSD came under State control, i.e., in FY's 2021, 2022, 2023 and now, 2024, the City of Providence has appropriated the exact same amount of money to PPSD, and at no time was in compliance with the Crowley Act's plain maintenance of effort ("MOE") mandate.

24.      The City's mandatory financial contribution to PPSD under the Crowley Act for FY25 is $160,416,352.  PPSD recognized that obligating this full amount would be challenging to the City, and subsequently requested $147,677,530 in City funding (a decline from the $147,950,978 requested in FY24). On May 17, 2025, PPSD learned from the City of Providence budget address that the City only plans to allocate $133,046,611 for FY25.

25.      On August 15, 2023, the Commissioner of Education, after an evidentiary hearing, issued a decision holding that the City of Providence had provided some $25 million less to PPSD than the amount mandated by the statutory maintenance of effort provision governing intervention in failing school districts for fiscal year 2024.  (A copy of the decision is attached to the Scott Aff. as Exhibit A).  However, the decision and subsequent withholding order directing the General Treasurer to withhold a portion of the amount owed from non-education-

related State aid allocated to the City was stayed on appeal by Superior Court, *see Brett P. Smiley, et al. v. Angélica Infante-Green*, C.A. No. PC-2023-03940 (Lanphear, J.), and the City's appeal is currently in mediation.

26.    Restructuring JSEC and 360 High School together to create the JSLSI will not only expose students to innovative and engaging programming for in-demand, high-paying life sciences fields, **it also will realize approximately $1.5-2 M in cost savings.**

### iii.    Current Placement of MLL Students and Teachers

27.    Teacher and student placement for SY 24-25 is underway and presently, JSLSI has made offers of continued employment to 19 teachers at 360.  To date, 17 students out of 286 have asked to be assigned to another school.

### C.    The DOJ Settlement Agreement and Oversight

28.    On November 21, 2016 – three years prior to the State intervention under the Crowley Act – the United States Department of Justice ("DOJ") notified PPSD that it was opening an investigation in response to complaints that the District was not meeting its obligations to provide language acquisition services to its MLL students or meaningful communications to Limited English Proficiency ("LEP") parents. The DOJ requested, and the District produced, thousands of documents and requests for data. In addition, the DOJ did a number of site visits to schools, the administration building, and the District Registration Center on April 24-28 and May 9-10, 2017.

29.    On March 8, 2018, the DOJ notified the District's attorneys of conditions which, in its judgment, constituted violations of the EEOA.  Specifically, the DOJ found that the District had:

(a)    placed hundreds of ELs in schools without EL program services and/or without voluntary and informed waivers of services;

12

(b)   utilized educationally unsound EL program(s);
(c)   inadequately implemented several of its EL programs;
(d)   failed to staff its EL programs with qualified teachers;
(e)   unnecessarily segregated some ELs;
(f)   provided insufficient materials at certain schools;
(g)   provided inadequate principal training;
(h)   failed to identify ELs in a timely way;
(i)   inadequately communicated with LEP parents;
(j)   failed to provide ELs with equal opportunities to participate in specialized programs;
(k)   used inappropriate criteria for exiting ELs from EL programs and inadequately monitored exiting ELs; and
(l)   failed to properly evaluate its EL programs for effectiveness.

30.     The District and the DOJ entered into the Settlement Agreement on August 9, 2018.  A copy is attached to the Roldán Aff. as Exhibit J.

31.     Legal counsel for the District, in conjunction with various District personnel, including the Director of MLLs (and eventually representatives of RIDE), participated in calls and virtual meetings with three to four DOJ attorneys and an educational consultant on an almost daily basis from the inception of the Settlement Agreement in August of 2018 through February of 2023. In addition, the DOJ made site visits to nearly all Providence schools, visiting semiannually, including a "virtual visit" during the 2020-2021 School Year.  In addition, the DOJ issued regular monitoring letters during this time.

32.     On September 29, 2021, the District entered into an Extension of the Settlement Agreement in which the DOJ recognized that:

> the District has made some significant progress in meeting its obligations under the Agreement. Specifically, the District has devoted resources toward the identification of ELs, oral and written communications with parents, professional development for teachers and staff, curriculum for English Language Development classes, and English as a Second Language ("ESL") certification for its teachers.

*See* Roldán Aff. at Exhibit K.  The Extension Agreement is set to expire on May 15, 2024.

13

33.    With the assistance of RIDE, the District has made significant progress with respect to its compliance with the Settlement Agreement and its services to MLLs and their families, which includes the following:

    (a)   The District changed its enrollment procedures immediately after the execution of the 2018 Settlement Agreement to include giving a home language survey to all enrolling students and screening all students whose families indicated a language other than English on the home language survey and for the past two years, the District has run a monthly report of all registered students to ensure that all have completed a home language survey and have been screened if necessary.  As noted in DOJ's February 8, 2023 monitoring letter to the District, "the District's data reports reflect improvements in identifying and assessing EL students. According to the October 2022 report, the District administered English Language Proficiency assessments to all but 15 of the 13,000 students identified as having a home language other than English on the home language survey";

    (b)   Beginning in the 2018-19 School Year, the District eliminated the consultation model and revamped the collaboration model. Prior to the Settlement Agreement, no students in the District were receiving an explicit period of ESL English Language Development. In its first year of the Settlement Agreement, the District scheduled less than 50% of students for an ESL English Language Development period. In the past three years, the District has consistently scheduled 98% of its MLL population for the appropriate amount of ESL, both English Language Development and embedded ESL.  The DOJ noted in its February 8, 2023 monitoring letter that "the District has made noteworthy strides in its scheduling and delivery of ESL";

    (c)   The District drastically revised its protocols regarding families who opt students out of MLL services in 2020. Before that change, families could opt their child out of services permanently with a one-time signature. Beginning in 2020, only a parent/guardian or eligible student was permitted to opt a student out of services. According to current protocol, students can only be opted out of services after a parent/guardian meets with a fully ESL or Bilingual/Dual Language certified and trained staff to discuss the waiver decision. The meeting is conducted in the parent/guardian's preferred language with applicable interpretation and translation services. Since the inception of the new MLL waiver protocol in 2020, the District has historically low levels of students opting out of MLL services, with an overall opt out rate of 2.3% in its last reporting to DOJ. Further, no school has an opt out rate of higher than 10%;

    (d)   The District undertook great efforts to provide sheltered content instruction training and coaching to all core content teachers of MLLs.  According to July 2023 reporting data, 93.8% of MLLs received at least one period of SCI content instruction from a qualified teacher according to the Settlement Agreement and 84% of MLLs received at least two periods of SCI content instruction as required by the Settlement Agreement;

(e)  The District discontinued its Sheltered ESL program in the 2022-2023 School Year and no longer segregates any MLL students outside of those in a newcomer program, which they do not stay in beyond two years;

(f)  The District changed all teacher job postings to indicate that ESL certification was preferred for all certified teaching jobs. In addition, the District began an aggressive and years long initiative to convert teaching positions in the District to require an ESL certification. The District paired this initiative with an incentive plan that allowed all core content teachers of MLLs to receive reimbursement for up to eight thousand ($8,000) dollars to receive their ESL certification. Beginning in 2023, the District also offered teachers the option to have tuition paid directly to certification granting schools so that teachers would not have to come out of pocket for tuition monies associated with receiving ESL certification. As of the 2023-2024 School Year, the District employs five hundred eighty-seven (587) teachers who are fully ESL, Bilingual or Dual Language certified. It employs another one hundred fifty-five (155) teachers who have expert residency in ESL (have completed some courses toward certification). The number of teachers has steadily increased, with two hundred thirty-eight (238) teachers who were utilizing or had used the District's incentive program to obtain ESL certification in July 2022 data reporting to DOJ and 432 teachers who were utilizing or had used the District's incentive program to obtain ESL certification in July 2023 data to DOJ;

(g)  Jennifer Efflandt was appointed as the Director of MLLs in 2018. She is an experienced administrator who had previously worked as an MLL coach, coordinator, and consultant, as well as an Early Childhood, Dual Language, and ESL teacher. In addition, the Office of Multilingual Learners has been vastly expanded and now consists of a full time Director of Multilingual Learner Instruction & Services, Supervisor of Dual Language Programs & Services, Coordinator of Multilingual Learners, Elementary Manager of Multilingual Learner Instruction, two Multilingual Learner Manager and Manager of Multilingual Learner Instruction & Services for Middle School and Times 2.  All these positions are filled with experienced administrators and former MLL or Bilingual teachers;

(h)  The District entered into a contract with WestEd, who helped it develop thirty (30) hours of DOJ approved training modules on sheltered content instruction (hereinafter "SCI") for all teachers. According to the District's July 2023 data submission, three hundred sixty-four (364) core content teachers of MLLs completed all thirty (30) hours of SCI professional development and another one hundred and five (105) were on track to complete SCI sessions. Another one hundred twenty-eight (128) were new teachers who had started the professional development sessions. This is a total of five hundred and ninety-seven (597) non-ESL certified teachers who met the DOJ's professional development requirements to teach core content SCI classes out of a possible six hundred fifty-four teachers. The District also implemented an SCI coaching program to assist in completing its in classroom support requirement under the Settlement Agreement.  Four hundred ninety-six (496) core content teachers of MLLs completed all fifteen hours of SCI coaching and another ninety-one (91) were on

track to complete the coaching sessions. Another thirty-one (31) were new teachers who started the coaching sessions. This is a total of six hundred eighteen (618) non-ESL certified teachers who met the DOJ's coaching requirements to teach core content classes out of a possible six hundred fifty-four teachers;

(i)     The District has invested in high quality English Language Development curriculum, including Vista Higher Learning- Connect for ELD at the Elementary level, Vista Higher Learning- Get Ready for Elementary level Newcomers, Cengage- INSIDE Levels A, B and C for Middle School Level, Vista Get Ready and Imagine Learning for Middle School level Newcomers, Edge Reading, Writing & Language Fundamentals A, B & C (both digital and hard copy) for High School level, and Vista Higher Learning- Get Ready for High School level Newcomers. In addition, the District purchased Rosetta Stone as a supplemental material for all High School levels MLLs. The District also invested in a new English Language Arts and Social Studies curriculum at the Elementary and Middle School levels, American Reading Company, that aligns with its English Language Development curriculum and is more accessible to MLLs. District teachers and staff also received extensive professional development and coaching from Vista and American Reading Company concerning curriculum implementation;

(j)     After the execution of the Settlement Agreement, the District began asking parents/guardians for their preferred language on each home language survey. This information is captured in the District's information system for MLLs, Ellevations and in its student information system, Skyward. It is accessible to all teachers and administrators. Further, the District implemented the usage of Kinvolved, a messaging app which translates all District messages into a parent/guardian's preferred language and allows for two-way messaging while translating messages between the parent/guardian and the school. In 2020, the District entered into a contract with Lionbridge for all interpretation services and Effectiff for translation services. Lionbridge offers interpretation by phone in over three hundred and fifty (350) languages and is immediately available in all Major Languages. Lionbridge usage is monitored on a monthly basis by school and during the 2022-23 school year, it was used for 114,955 minutes of interpretation calls in forty-four languages. Effectiff was used beginning in 2020 to translate all IEPs, 504s and associated documents, as well as all disciplinary documents into every parent/guardian's preferred language. The District also uses Effectiff to translate all District and school based documents to parents/guardians into preferred languages. During the 2022-23 school year, 4,357 documents were translated into over thirty-five languages.

(k)     The District took several steps to increase the MLL population in each of the cited programs.

     i.     **Middle School Advanced Academics**: The District expanded the Middle School Advanced Academics program to include Advanced Academics at additional District middle schools, giving MLLs a greater opportunity to participate. In addition, students were offered the opportunity to participate in particular classes within Advanced

16

Academics, as opposed to a prior policy which required that students take all core content classes in Advanced Academics, which disproportionately impacted MLLs who may not have been ready to take ELA Advanced Academics due to language acquisition issues. Further, the District took great strides to adequately train administrators to identify MLLs who they felt would be successful in Advanced Academics. The MLL Office then personally contacted each family. In contrast to the 2016-2017 School Year in which zero (0) active MLLs were participating in middle school Advanced Academics, in the 20222023 School Year, 31 active MLLs participated in Advanced Academics at the middle school level, representing approximately 17% of the total population of students in middle school Advanced Academics;

ii.   **Classical:** The District has undertaken numerous initiatives to increase the number of MLLs enrolled at Classical High School, including offering the admissions test during the school day for all interested District middle school students and bussing all students to the testing site who are interested in taking the admission test. The District has also added a member of the MLL Office to the Classical admissions team and offered information regarding Classical in all Major Languages in the District. The District has also put out an RFP for an admissions exam in multiple languages for the 2024-2025 School Year. Finally, Classical has assembled a working group which has developed a long-term plan to increase its percentage of MLLs. Classical's number of enrolled active MLLs has improved from one (1) during the 2016-2017 School Year to thirty-four (34) in the 2023-2024 School Year; and

iii.  **CTE:** The District has also undertaken numerous measures to increase the number of MLLs in its CTE programs, including increasing the number of seats available to MLLs in CTE in accordance with the number of MLLs in the District and interest level. In the 2022-2023 School Year, 131 active MLLs were enrolled in CTE throughout the District, representing 31% of the total population of students in CTE in the District, a substantial increase from the 11% enrolled in the 2016-2017 school year;

(l)   Since entering into the Settlement Agreement, the District has retained a consultant, Dr. Ortiz, who is an expert in the evaluation of MLLs with suspected disabilities. Dr. Ortiz has provided numerous professional development workshops for special education teachers and administrators in the district. The District has also used his expertise to help develop a Special Education guidebook that provides a centralized location for policies, forms, checklists, and other documents to assist in the assessment of MLLs who are dually identified or suspected to have a disability. The District has also created a specific administrative position that works as a liaison between the Special Education Office and the MLL Office and who is an expert on dually identified students. The District has also created a uniform system of MTSS across the District, which

17

has greatly benefited MLLs. As noted by the DOJ in its February 8, 2023 monitoring letter, MLLs were identified for special education services at nearly the same rate as non-MLL students across the District and "in contrast to previous years, the identification rate was similar within nearly all of the District's school." The DOJ stated that "this data suggests that the District has made strides towards ensuring that Els are not denied special education services on account of their language needs"; and

(m)  Beginning in October of 2022, the District was able to comply with all data requirements in the Settlement Agreement and file timely annual reports in July of 2022 and 2023, as well as provide the DOJ with frequent supplemental data requests. In addition, the District invested in a data warehouse which allows it to run monthly reports on all DOJ compliance matters regarding the monitoring of MLLs. The District also utilized Brown University Policy Lab to help it submit two longitudinal studies to the DOJ in compliance with its Settlement Agreement. As noted by the DOJ in its February 8, 2023 letter, "After years of pulling data from multiple sources with inconsistent and unreliable results, the District now appears to have a reliable and accessible data warehouse from which EL data can be disaggregated by a number of variables and analyzed. We recognize that this has not been an easy endeavor, and we commend the District staff for their persistence in creating a system that can be used to ensure that EL students are appropriately served."

34.    Since entering the Settlement Agreement with the DOJ, the District has worked diligently to ensure compliance with its terms and serve its MLL students and LEP parents. The District is in compliance with all nine (9) key areas identified by the DOJ.

First, relative to the identification and placement of students, the District's implementation of a monthly reporting system and training of Registration Center staff allows it to adequately identify, screen, and place students as required by the Settlement Agreement.

Second, the District's revamping of its collaboration model and waiver policy, as well as the discontinuation of its sheltered ESL program, has allowed the District to expand access to MLL services and core curriculum in accordance with the terms of the Settlement Agreement.

Third, the District's addition of a Director of MLL Services and its greatly improved recruiting and incentive programs have allowed it to dramatically increase the number of adequately trained staff working with MLLs.

Fourth, the District's DOJ approved professional development programs have allowed it to comply with the required training for staff under the terms of the Settlement Agreement.

Fifth, the District has made the necessary investments in high quality curriculum and resources for MLLs.

Sixth, the District can adequately communicate with LEP parents because of the technological and translation services its implemented.

Seventh, the District's various initiatives have markedly expanded MLL access to advanced academics and CTE programs since the inception of the Settlement Agreement.

Eighth, with the help of the District's consultant and development of the Special Education guide, the District is able to identify and evaluate MLLs for special education services as required by the Settlement Agreement.

Finally, the District's investment in a database and longitudinal studies have allowed it to develop a system to monitor, evaluate, and report that has been commended by the DOJ.

In short, The District has demonstrated that it is ready to exit the Settlement Agreement and has the necessary resources in place to continue its success.

**D.    The Blueprint for MLL Success**

35.    From 2010 to 2020 Rhode Island has experienced one of the greatest rates of increase in MLLs in the country.  There are now two times as many MLLs enrolled in school year 2023-2024 as was the case a decade ago, and the State is currently home to some 18,422 MLLs, which represents some 13.5% of the State's students.

36.    The Ed. Council has promulgated the State's MLL Regs., which "are intended to support compliance with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*.) and the Equal Education Opportunities Act of 1974 (*See* 20 U.S.C. § 1703 (f))."  *Id*., 200-RICR-20-30-3.1(A).  The MLL Regs have been the subject of substantial revision, and amended MLL Regs will be the subject of a statewide public comment process in the Fall.

37.    RIDE is a member of the World-Class Instructional Design and Assessment ("WIDA") consortium, which focuses on ensuring high-quality instruction and supports for

MLLs, and has adopted WIDA's suite of ACCESS assessments as its federally mandated annual English language proficiency assessment

38.    To guide the shifts in educational practice necessary for MLLs to thrive, a RIDE Planning Team recruited individuals from local education agencies, universities, community organizations, and offices at RIDE and PPSD to form workgroups, which resulted in Rhode Island's *Blueprint for Multilingual Learners* (the "Blueprint") (a copy of the Blueprint is attached to the Roldán Aff. as Exhibit L), which the Ed. Council approved in 2021.

39.    The Blueprint was premised up the following five principles:

Principle 1:  An asset-oriented system embraces expectations and approaches to value, respect, and sustain MLL languages and cultures.

Principle 2:  A high-quality instructional system (including curriculum, instruction, materials, assessments, and professional learning) provides access to rigorous standards-aligned learning opportunities and empowers students.

Principle 3:  A family- and community-centered system maximizes the assets of families, communities, and schools so MLLs reach their full potential.

Principle 4:  A research- and data-informed system holds all educators responsible for continuously strengthening MLL education.

Principle 5:  A coherent and nimble system aligns policies, resources, and practices to increase MLL achievement.

40.    In furtherance of its Blueprint, RIDE:

- Published the High-Quality Instructional Framework;
  - Partnered with English Language Success Forum and
  - Provided Math Curriculum Access Training in 2023-24;
- Supported expansion of MLL Endorsement options;
  - Expanded # MLL Endorsement programs and
  - Developed MLL Leadership Endorsement with URI;
- Collaborated on improvement strategies with PPSD and five other partner Districts;
- Built MLL Data Visualizations;
- Launched parent engagement with a parent advocacy group; and

- Partnered with the RI Foundation to support 5 LEAs, including PPSD, with Bilingual/Dual Language Planning Grants.

41.    In addition, RIDE has provided access to high-quality curriculum materials.

42.    **Last fiscal year alone, PPSD spent $56,500,000 on programs expressly dedicated to MLLs.**

43.    As a result, Rhode Island has almost completely closed the performance gap between recently exited MLL students and students who were never identified as MLLs using RICAS/SAT assessment results as the benchmark.

**E.    The Redesign Models and Plans**

44.    Rhode Island's State ESSA Plan was approved by the U.S. Department of Education on March 29, 2018 and most recently amended on December 18, 2023.  Under the Plan, schools that have been identified for CSI and have failed to meet exit criteria within four years of identification must undergo a school redesign process.  *See* ESSA State Plan, p.55. (A copy of the Plan is attached to the Roldán Aff. as Exhibit M).  "Through a School Redesign, LEAs will authentically engage with their educators and Community Advisory Boards . . . to fundamentally redesign and relaunch the school as a model that will be best positioned to address student needs and promote student achievement." *Id*.

45.    LEAs may choose from one of five redesign options: Empowerment, Restart, Small Schools of Choice, LEA Proposed Redesign, or Closure.  *Id*. at 56. "The model selected by the LEA should be grounded in data accompanied by thoughtful analysis of why school improvement efforts thus far have been insufficient."  *Id*.  "LEAs must submit their School Redesign plans to the [Ed. Council] for approval." *Id*.  Once approval is granted, the LEA will be "publicly classified as 'New School Redesign' instead of a school identified for comprehensive support and improvement for up to two years."  *Id*.

21

46.    During a public meeting held on July 18, 2023, the Ed. Council undertook the review of School Redesign applications for five schools within the PPSD that were identified for CSI.  *See* Ed. Council minutes of the meeting at Enclosure 6a, a copy of which is attached to the as Exhibit N.  These schools included: Hope High School, William B. Cooley Sr. High School at the Juanita Sanchez Educational Complex ("JSEC"), Mt. Pleasant Early College and Career Academy, Dr. Jorge Alvarez High School, and Governor Chrisopher DelSesto Middle School. *Id*.

47.    The Redesign application process consisted of three stages:

Stage 1 - Redesign Application Submission
Stage 2 – Review
Stage 3 – Review and Final Recommendations

*Id*.  During each stage, PPSD received feedback from trained third-party evaluators against the standards articulated in the application rubric.  *Id*.

48.    In Stage 1, PPSD submitted their finalized School Redesign Applications to RIDE by April 7, 2023.  *Id*.  In turn, RIDE provided feedback on April 28, 2023.  *Id*.  In Stage 2, PPSD addressed deficiencies in their applications, as identified by RIDE's feedback, within a seven-page written response.  *Id*.  This stage was completed on May 12, 2023.  *Id*. In Stage 3, PPSD had the opportunity to remedy any remaining areas of deficiency during three-hour capacity interviews.  *Id*.  This stage was completed on June 16, 2023.  *Id*.

49.    The Superintendent's recommendation with respect to JSEC's Redesign Application Plan highlighted: (1) "[t]he school has chosen to expand its strongest pathway programming in biomedical sciences . . . The current pathway offers some of the most project-based, engaging, and rigorous curricula at the school"; (2) "[t]he school's proximity to local hospitals and research institutions . . . will provide opportunities for work-based learning and

partnerships with key experts in the discipline of biomedical research and science," which "will support industry speakers and presentations, student internships, and field trips"; and (3) "[t]he Linked Learning model provides a nationally-proven instructional framework that emphasizes work- and project-based learning." *Id.*.

50.    While JSEC's Redesign Plan expands its specialization in the biomedical center, it also "supplements [the biomedical pathway] with additional advanced coursework and internship opportunities as well as comprehensive support services for multilingual learners (MLLs) and differently-abled students." *Id.* JSEC's Redesign Plan focuses on the Linked Learning framework, through which "students learn through a pathway connected to a local industry sector—design, energy, agricultural science, engineering, information technology, arts and entertainment, advanced manufacturing, healthcare, and more.  No matter the pathway available to them, students discover that learning makes sense when there is a clear connection to the real work, and the skills and mindsets they gain have relevance that transcends any given sector." *Id.* (citing Linked Learning Alliance, 2023).

51.    "The Linked Learning model provides a nationally proven instructional framework that emphasizes work- and project-based learning ("PBL")," with "the benefits of embedding a PBL instructional approach within a Linked Learning model hav[ing] the potential to support the school in building internal coherence and supporting both teacher and student mindset." *Id.*  "The rigor and relevance associated with PBL units and the metacognitive, reflective, and interpersonal skills students will learn though engagement in PBL will also promote equity and access for students, many of whom represent historically marginalized groups." *Id.*

52.     Deriving from this Linked Learning framework, JSEC's Redesign Plan key design elements include:

    (a)   Academic Core, defined as "rigorous college preparatory courses in English, math, science, social studies, foreign language, and visual arts";

    (b)   Technical/Professional Core, defined as "emphasis on the practical use of academic learning and preparation for high-skill, high-wage employment";

    (c)   Real-World Learning Opportunities, defined as "meaningful work-based experiences including internships, apprenticeships and school-based enterprises that deepen students' understanding of academic and technical knowledge through application"; and

    (d)   Support Services, defined as "individualized supports, including counseling and supplemental instruction, to help students master the advanced academic and technical content necessary for success."

*Id.*

53.     In addition to the JSLSI, other PPSD high school redesign plans include:

- **Mount Pleasant Early College & Career Academy**, which will be an early college model school with dual and concurrent enrollment that offers CTE programs in advanced manufacturing, pre-engineering, teacher, academy, and computer science, including partnerships with RIC, URI, and industry partners.

- **Hope Visual & Performing Arts**, which will offer integrated arts with a focus on project-based learning and interdisciplinary instruction, including partnerships with RISD, Brown, and community art organizations;

- **Dr. Jorge Alvarez High School of Healthcare & Finance**, will focus on careers in healthcare and finance career pathways with project-based learning and work-based learning instruction, including partnerships with RI hospitals, RI Nursing Education Center, NAF, and local and national financial institutions.

54.     Finally, at the conclusion of the Redesign application process, the Ed. Council approved all the PPSD applications under Rhode Island's ESSA State Plan during its July 18, 2023 meeting, to be effective at the beginning of the 2023-2024 school year, noting that the proposals "meet[] the expectations of redesign and will provide the students and community with high-quality academic opportunities." *Id.*

### III. ARGUMENT

1.    **The Complaint should be dismissed under the doctrine of administrative exhaustion.**

Plaintiffs are required to exhaust available administrative remedies before attempting to invoke this Court's federal question jurisdiction. The United States Supreme Court has noted that exhaustion of administrative remedies is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *Heckler v. Ringer*, 466 U.S. 602, 619, quoting *Weinberger v. Salji*, 422 U.S. 749, 765 ("purpose of exhaustion is to prevent 'premature interference with agency processes' and to 'give the agency a chance to compile a record which is adequate for judicial review'"). As noted by the Rhode Island Supreme Court:

> [r]equiring the exhaustion of administrative remedies (1) aids judicial review by allowing the parties and the agency to develop the facts of the case, and (2) 'it promotes judicial economy by avoiding needless repetition of administrative and judicial fact-finding, perhaps avoiding the necessity of any judicial involvement.'

*Almeida v. Plasters' and Cement Masons' Local 40 Pension Fund*, 722 A.2d 257, 259 (R.I. 1998), quoting Schwartz, *Administrative Law* § 8.33 at 542 (1991), and citing *Burns v. Sundlun*, 617 A.2d 114, 117 (R.I. 1992); *see also Downey v. Carcieri*, 996 A.2d 1144, 1150-51 (R.I. 2010) (exhaustion "aids judicial review by allowing the parties and the agency to develop the facts of the case"); *Richardson v. RIDE,* 947 A.2d 253, 259 (R.I. 2008) ("It is well settled that a plaintiff aggrieved by a state agency's action first must exhaust administrative remedies before bringing a claim in court.").

Here, Plaintiffs' claim that "they have no other avenue to change the PPSD/RIDE decision to close the school" other than "a petition to this Court," *see* Complaint, ¶ 84 at p. 32, is belied by R.I. Gen. Laws § 16-39-1, which makes perfectly clear that:

> [p]arties having any matter of dispute between them arising under any law relating to schools or education may appeal to the commissioner of elementary and secondary education who, after notice to the parties interested of the time and place of hearing, shall examine and decide the appeal without cost to the parties involved.

*Id.* The Commissioner's decision is then subject to an appeal to the Ed. Council, and eventually to the Superior Court. *See* R.I. Gen. Laws §§ 16-39-3 and 16-39-4.

The First Circuit delineated the specific exceptions to the exhaustion doctrine in *Pihl v. Massachusetts Department of Education*, 9 F.3d 184, 190-91 (1st Cir. 1993). Although *Pihl* involved the federal Individuals with Disabilities Education Act, 20 U.S.C.A. §§ 1400, *et seq.*, the Rhode Island Supreme Court has stated that it is "in full agreement" with the First Circuit "categorization of the several exceptions to the normal rule requiring exhaustion of administrative remedies," *Doe v. East Greenwich*, 899 A.2d 1258, 1266 (R.I. 2006), which were limited to situations when:

> (1) the administrative process would be 'futile or inadequate;' (2) the administrative process would 'waste resources, and work severe or irreparable harm on the litigant;' (3) the issues raised 'involve purely legal questions;' or (4) the agency prevents 'the litigant from pursuing [his or] her claim at the administrative level.'

*Id.*, quoting *Pihl*, *supra*, 9 F.3d at 190–91. However, none of the recognized exceptions to the doctrine are applicable here.

The Commissioner is quite familiar with expediting the hearing process when necessary and Plaintiffs, who learned about the challenged decision on February 6 and 7, 2024, *see* Complaint, ¶ 66 at p. 27, *and who have not yet bothered to file a motion for injunctive relief,* should be estopped from now claiming that there is not sufficient time to exhaust the mandatory state administrative remedy.

26

The fact that RIDE approved PPSD's decision to merge JSEC and 360 does not render the administrative appeal process "futile or inadequate." Many of the hearings under § 16-39-1 involve challenges to a decision or policy made by the Commissioner, and RIDE is no stranger to cases challenging school closings which, under state law, must be supported by "good cause." *See* R.I. Gen. Laws § 16-2-15 (school committee "shall not abandon, close, or change the location of any school without good cause"). *See, e,g, Bryan Principe, et al. v. Providence School Board*, RIDE No. 0016-07 (June 18, 2007) (relocation of the West Broadway Elementary School); *In re Closing of the Prudence Island School*, RIDE No. 0024-07 (October 3, 2007); and *Newport Parents and Citizens v. Newport School Committee*, RIDE No. 0017-06 (June 9, 2006) (closing of the Sheffield School).

If for some reason the Court concludes that the Plaintiffs' Complaint should not be dismissed for failure to exhaust available state administrative remedies, Defendant's motion for summary judgment should nonetheless be granted.

### 2.    The Standard for Summary Judgment under Rule 56

As this Court has very recently noted:

> Rule 56 of the Federal Rules of Civil Procedure requires the Court to grant summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56. More particularly,
>
>> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.
>
> *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When deciding whether to grant summary judgment, the Court must 'view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.' *Barbour v. Dynamics Rsch. Corp.*, 63 F.3d 32, 36 (1st Cir. 1995) (citation omitted). '[M]ere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.' *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). " '[G]enuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party .... '[M]aterial' means that the fact is one that might affect the outcome of the suit under the governing law." *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994) (internal quotation marks and citations omitted).

*Santiago v. Sheridan*,  2024 WL 1604668 at *1-*2 (D.R.I., April 12, 2024) (McConnell, J.).

Moreover, as the First Circuit noted in *Vinberg v. Bissonette*, 548 F.3d 50, 55, an issue is "genuine" for summary judgment purposes if it "'may reasonably be resolved in favor of either party.'" *Id*., (quoting *Garside v. Osco Drug, Inc*., 895 F.2d 46, 48 (1st Cir.1990).  And a fact is "material" "only if it possess[es] 'the capacity to sway the outcome of the litigation under the applicable law.'" *Id*. (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995)).  Although, as noted, the perspective favors the non-movant, they

still must demonstrate, 'through submissions of evidentiary quality, that a trialworthy issue persists.' *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir.2006). Moreover, '[o]n issues where the nonmovant bears the ultimate burden of proof, [she] must present definite, competent evidence to rebut the motion.' *Mesnick v. Gen. Elec. Co*., 950 F.2d 816, 822 (1st Cir.1991). These showings may not rest upon 'conclusory allegations, improbable inferences, and unsupported speculation.' *Medina–Muñoz v. R.J. Reynolds Tobacco Co*., 896 F.2d 5, 8 (1st Cir.1990).

*Id*. at 56.

Here, mere differences in the recitation of assessment or survey data does not create a "genuine issue of material fact" for summary judgment purposes since, as will be shown, the differences are reconcilable through the introduction of public records which are the proper subject of judicial notice.  *See* Roldán Aff., ¶¶ 19-23 pp. 6-7.  Indeed, it appears that Plaintiffs have the mistaken impression that a survey of student and parent preferences – a survey undertaken *after* knowledge of the challenged decision had become the focus of opposition

28

among 360 staff – should be given more weight when creating educational policy than the actual academic performance of students. *See* Complaint, ¶¶ 63-65, 69-72 at p. 26-27, 29. Indeed, much of the Complaint consists of the personal stories of the eight (8) named Plaintiffs which, while compelling, are not the focus of the three-part test announced in *Castaneda*. (Discussed *infra* at p. 32).

Much of the Complaint consists of legal argument and sweeping conclusions devoid of factual support. Thus, Plaintiffs allege:

(a)    that they need to be protected from "losing the significant and unusual support found in their current school for Spanish speaking students and their parents," Complaint, ¶ 6 at p. 3, but *fail to specifically identify what "significant and unusual support" they are referring to or why it cannot be provided at any other high school*;

(b)    that they will be required to attend a school "that is, in all critical regards relating to their language access and support, lower performing than the school being closed," *id.*, ¶ 8 at p. 3, *but ignore the fact that they will have the same freedom of choice regarding school selection as any other PPSD student, and the school they claim will be "lower performing" will no longer exist but has been redesigned as the JSLSI*;

(c)    that "this school closure will deny Plaintiffs access to equal educational opportunity on the basis of their national origin as they are multilingual learners (MLLs) who require additional intentionally designed instruction and support to acquire English fluency sufficient to succeed in their instructional programs," *id.*, ¶ 9 at p. 4, *while completely failing to allege facts to support the speculation that PPSD will violate the law and deny the Plaintiffs "access to equal educational opportunity*;"

(d)    that "evidence shows that school closures immediately harm the educational outcomes of students displaced from the closed school, harm that continues both short and long term, and violates the rights of the parents to be fully included in their children's education as required by the EEOA," *id.*, ¶ 10 at p. 4, *while citing inapplicable studies involving the closing of school buildings and disinvestments in communities and ignoring the fact that the school they seek to preserve is one of the worst performing in the District*;

(e)    that the fact that 360 "boasts the longest serving high school principal in the district, part of an experienced administrative team including a principal and assistant principal who have worked with the stable faculty of the school for

most of the nine years of the school's existence" is evidence supporting its continued existence, *see id*., ¶ 75 at p. 30, *while simply ignoring the dismal academic performance of 360 students*;[7] and

(f)    that the facts here are akin to those in landmark cases involving racial segregation and intentional discrimination such as *Brown v. Board of Education* and *Lau v. Nichols*, *id*., ¶¶ 1,3 and 11, *while at the same time effectively conceding that these landmark cases are irrelevant by failing to invoke either the Equal Protection Clause or anti-discrimination statutes pursuant to which these landmark cases were decided*.

In addition, the Plaintiffs make repeated reference to the 2018 Settlement Agreement between PPSD and the Department of Justice (the "DOJ") which was entered into years prior to the State intervention under the Crowley Act, *see* Complaint, ¶¶ 5, 53-57 at pp. 2-3, 22-25, while ignoring the fact that, as noted by Dr. Roldán, "the District has worked diligently to ensure compliance with its terms and serve its MLL students and LEP parents," "is in compliance with all nine (9) key areas identified by the DOJ," and "has demonstrated that it is ready to exit the Settlement Agreement and has the necessary resources in place to continue its success." *See* Roldán Aff., ¶¶ 30-31 at pp. 9-15.

In short, there are no genuine issues as to any material fact and as will be shown, the Defendants are entitled to judgment as a matter of law.

**3.    Plaintiffs claim under the EEOA is fatally flawed since the decision to merge 360 was supported by "good cause" and a sound educational theory reasonably calculated to achieve the desired educational objectives.**

Congress passed the EEOA pursuant to its authority to enforce the Equal Protection Clause of the Fourteenth Amendment to ensure that no student was denied "equal educational opportunity." 20 U.S.C. § 1703.  The EEOA states that:

> No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

---

[7] Public education must be the only field where consistent failure with respect to the central mission of an organization leads to the conclusion that no personnel changes should be made that impacts those on the ground who, according to the data, are in the best position to effect needed change.

* * *

> (f) the failure by an educational agency to take *appropriate action* to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703 (emphasis added).

One commentator has claimed that Congress passed the EEOA, in part, to provide a private right of action to enforce Title VI's implementing regulations and thereby "codify the legal protections afforded to ELLs under *Lau v. Nichols*, 414 U.S. 563 (1974)," which was the first Supreme Court decision recognizing a disparate impact claim under Title VI. *See* Amy Leipziger, *Watch Your Language: How a School District's Failure to Provide Meaningful Communication has Impacted Students During the Pandemic*, 2021 B.Y.U. Educ. & L.J. 95, 104-105 (2021).[8]

Yet, the remedial section of the EEOA codifies an underlying respect for principles of federalism, providing that, "[i]n formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws, a court, department, or agency of the United States shall seek or impose *only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws*." 20 U.S.C. § 1712 (emphasis added).[9]

---

[8] Noting that "the EEOA was passed as a floor amendment to the Education Amendments of 1974, and had no legislative history that year; however, there is a legislative history attached to the identical bill introduced in 1972. That bill failed to receive Senate approval. For a further discussion, *see* Sandra Del Valle, *Language Rights and the Law in the United States: Finding Our Voices,* 243, 270 (2003); Eric Haas, *The Equal Educational Opportunity Act 30 Years Later: Time to Revisit "Appropriate Action" for Assisting English Language Learners*, 34 J.L. & EDUC. 361, 361 (2005).

[9] It also should be noted that "the language and structure of the EEOA firmly indicate that Congress authorized only equitable remedies for violations of the statute" and thus "monetary damages are unavailable under the EEOA." *Mumid v. Abraham Lincoln High School*, 618 F.3d 789, 799 (8th Cir. 2010).

As noted, *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981) has been described as the seminal case under the EEOA.[10]  In *Castaneda*, Hispanic students alleged that their school district's failure to implement a bilingual-education program impeded their ability to overcome language barriers. *Id*. at 992. The Circuit Court in *Castaneda* created a three-part test to decide what "appropriate action" looks like. 648 F.2d at 1009. First, courts must "examine carefully the evidence the record contains concerning the soundness of the educational theory or principles upon which the challenged program is based." *Id*. Second, courts must decide whether the programs and practices "actually used" by the school system are "reasonably calculated to implement effectively the educational theory adopted by the school." *Id*. at 1010. Third, if an otherwise sound and effectively implemented program fails to "produce results" indicating that language barriers are "actually being overcome," it may "no longer constitute appropriate action."  *Id*.; *see also Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 132 (3d Cir. 2017) (holding that "[a]n individual alleging a § 1703(f) violation must satisfy four elements: (1) defendant is an educational agency; (2) plaintiff faces language barriers that impede his equal participation in defendant's instructional programs; (3) defendant failed to take appropriate action to overcome those barriers; and (4) plaintiff was denied equal educational opportunity on account of his national origin."); *T.R. v. School Dist. of Phila*., 223 F.Supp.3d 321, 334 (E.D. Pa., 2016) and *Etalawy v. Lubbock Ind. School Dist*., 816 Fed.Appx. 958, 965 (5th Cir. 2020) (to same effect).

---

[10] In *Horne, supra*, the Supreme Court noted that:

> Courts in other Circuits have followed *Castaneda's* approach. *See, e.g., Gomez v. Illinois State Bd. of Educ*., 811 F.2d 1030, 1041 (C.A.7 1987); *United States v. Texas*, 680 F.2d 356, 371 (C.A.5 1982); *Valeria G. v. Wilson*, 12 F.Supp.2d 1007, 1017–1018 (N.D.Cal.1998). No Circuit Court has denied its validity. And no party in this case contests the District Court's decision to use Castaneda's three-part standard in the case before us.

557 U.S. at 478.

In *Castaneda, supra*, the Court, *while making clear that "the EEOA is generally interpreted as preventing behavior "coextensive with that prohibited by the fourteenth amendment ...."* 648 F.2d at 1000–1001 (emphasis added), noted that:

> Congress has provided us with almost no guidance, in the form of text or legislative history, to assist us in determining whether a school district's language remediation efforts are 'appropriate.' Thus we find ourselves confronted with a type of task which *federal courts are ill-equipped to perform and which we are often criticized for undertaking prescribing substantive standards and policies for institutions whose governance is properly reserved to other levels and branches of our government (i. e., state and local educational agencies) which are better able to assimilate and assess the knowledge of professionals in the field*.

*Id*. at 1009 (emphasis added).

Thus, the *Castaneda* Court, while holding that state educational agencies must make a "genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of their students" under § 1703(f), 648 F.2d at 1009, also made clear that Congress afforded state and local authorities a "substantial amount of latitude" to choose the "programs and techniques they would use" to satisfy § 1703(f).  *Id*. at 1008; *see also Alonso as Next Friend of I.A. v. School Board of Collier County*, 2018 WL 5304813 at *14 (M.D. Fla. 2018) ("To satisfy the third part of the *Castaneda* test, Plaintiffs and the class must show that the Defendants' programs fail to produce results indicating that language barriers are actually being overcome and, thus, the programs do not constitute appropriate action."); *Valeria G. v. Wilson*, 12 F.Supp.2d 1007, 1017 (N.D. Cal. 1998) ("to prove a violation of Section 1703(f) at this time, plaintiffs must establish that the implementation of Proposition 227 could not, in any circumstance, constitute "appropriate action" as required by the EEOA"); *Quiroz v. State Bd. of Educ.,* 1997 WL 661163 at *4 (E.D. Cal. 1997) ("'to ascertain that a school system is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy.'") (quoting *Castaneda, supra*).

Similarly, in *Horne v. Flores*, 557 U.S. 433 (2009), which involved a class action claim by MLLs alleging that the State of Arizona had violated the EEOA by failing to take appropriate action to overcome language barriers, the Court noted that "[b]y simply requiring a State 'to take appropriate action to overcome language barriers' without specifying particular actions that a State must take, 'Congress intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the EEOA.'" *Id.* at 440-441 (quoting *Castaneda, supra*); *see also Gomez supra*, 811 F.2d at 1041 ("Our function is not to resolve disputes among the competing bodies of expert educational opinion. So long as the chosen theory is sound, we must defer to the judgment of the educational agencies in adopting that theory, even though other theories may also seem appropriate."); *McFadden v. Board of Educ. for Illinois School Dist. U-46*, 984 F.Supp.2d 882, 896 (2013) (holding that "procedures for identifying those children who need ELL instruction, tracking their progress, providing additional supports for exited ELL students, and other monitoring activities" sufficient under EEOA); *Teresa P. by T.P. v. Berkeley Unified School Dist*., 724 F.Supp. 698, 713 (N.D. Cal. 1989) ("This Court agrees with, and will heed, the warnings stated by the *Castaneda* Court itself that courts should not substitute their educational values and theories for the educational and political decisions properly reserved to local school authorities and the expert knowledge of educators, since they are ill-equipped to do so."); *Keyes v. School Dist. No. 1*, 576 F.Supp. 1503, 1518 (D. Colo. 1983) ("[i]t is beyond the competence of the courts to determine appropriate measurements of academic achievement," and expressing concern about "damage to the fabric of federalism" when national courts dictate local educational policy); *United States v. State of Texas*, *supra*, 680 F.2d at 374 (5th Cir. 1982) ("in

enacting section 1703(f), Congress left the state and local authorities substantial latitude to select programs and techniques of language remediation suitable to meet their individual problems").

The standard of review was succinctly summarized in *Flores*, *supra*, where the Court noted that "[u]nder the EEOA, the court's responsibility, insofar as educational theory is concerned, is only to ascertain that a school system is pursing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy."  48 F.Supp.2d at 938.

Here, Plaintiffs, while noting that "State and local level education officials have substantial authority to determine the configuration, staffing and programs of the public schools[,]" Complaint, ¶ 11 at p. 5, have based their request for extraordinary injunctive relief upon a series of unsupported generalizations and speculation, coupled with the individual stories of eight students, stories which, while compelling, do not address the fact that the school they seek to keep open has consistently been one of the wort-performing schools in the District from the standpoint of academic performance which, after all, is the primary manner by which any school should be judged.

By contrast, the Defendants have described an extensive series of steps, many of which were overseen and approved by the Ed. Council, coupled with the testimony of experts, and thereby satisfied the *Castaneda* test by proving both "the soundness of the educational theory or principles upon which [the challenged decision was] based," and establishing that the decision was "reasonably calculated to implement effectively the educational theory adopted . . ." 648 F.2d at 1009-1010.

4.    **Plaintiffs' action is premature, and their alleged damages are entirely speculative and do not support a claim for injunctive relief.**

The First Circuit holds that:

> 'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The movant's likelihood of success on the merits is the 'main bearing wall' of our analysis. *W Holding Co. v. AIG Ins. Co. - Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014).

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024).

Plaintiffs here cannot meet even one of the elements necessary for a preliminary injunction. Aside from their failure to exhaust available state administrative remedies, which alone is fatal to their claim (discussed *supra* at pp. 25-27), Plaintiffs are not likely to succeed on the merits, as has been discussed. In fact, Plaintiffs would only be irreparably harmed if the Court were for some reason to grant their request and force them to continue to attend a failing school, a result that would neither be equitable nor in the public interest.

The First Circuit has emphasized that "a preliminary injunction should not issue except to prevent a real threat of harm," *Matos ex rel. Matos v. Clinton School Dist.*, 367 F.3d 68, 73 (1st Cir. 2004), adding that "preliminary injunctions are strong medicine, and they should not issue merely to calm the imaginings of the movant." *Id.* The point was elaborated in a case that has been cited with approval by the Rhode Island Supreme Court, where it was noted that:

> [i]njunctive relief is appropriate only 'to prevent existing or presently threatened injuries' and 'will not be granted against something merely feared as liable to occur at some indefinite time in the future.' *Connecticut v. Massachusetts*, 282 U.S. 660, 674, (1930). *See also General Fireproofing Company v. Wyman*, 444 F.2d 391, 393 (2d Cir. 1971). *Injunctions will not be granted where the injuries complained of are prospective and 'which may, indeed, never occur.' Crimmins v. American Stock Exchange, Inc.*, 346 F.Supp. 1256, 1262 (S.D.N.Y.1972). The injury complained of must be of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm. *Hershey Creamery*

36

*Co. v. Hershey Chocolate Corp.*, 269 F.Supp. 45 (S.D.N.Y.1967); *see also Assn. of Professional Engineering Personnel v. Radio Corp. of America*,183 F.Supp. 834 (D.C.N.J.1960). *And the required showing of irreparable injury is not eliminated simply by virtue of a claim alleging violation of statutory or constitutional rights* (unless the requirement has been specifically eliminated by statute). Thus, in *United Fuel Gas Co. v. Railroad Commission*, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390 (1928), the Supreme Court noted:

> Suitors may not resort to a court of equity to restrain a threatened act merely because it is illegal or transcends constitutional powers. They must show that the act complained of will inflict upon them some irreparable injury. 278 U.S., at 310, 49 S.Ct., at 152 (Stone, J.)

*See also Newtex S.S. Corp. v. United States*, 107 F.Supp. 388 (S.D.N.Y.1952), aff'd, 344 U.S. 901, 73 S.Ct. 285, 97 L.Ed. 696; *Ellis Raw Bar v. District of Columbia Redevelopment Land Agency*, 139 U.S.App.D.C. 385, 433 F.2d 543 (1970).

*Ashland Oil, Inc. v. F.T.C.*, 409 F.Supp. 297, 308-09 (D.D.C.1976), aff'd. 548 F.2d 977

(D.C.Cir.1977) (emphasis added).

Thus, in *Valeria G. supra*, the plaintiffs, citing the EEOA, sought an injunction to enjoin

the implementation of a program "designed to keep limited English speaking students at grade

level in other areas of the curriculum by providing instruction in their native language at the

same time that an English language development effort is pursued." *See* 12 F.Supp.2d at 1012-

1013. The Court, however, noted that "in *Castaneda*, unlike the present case, the plaintiffs

challenged a program which had been in effect for a significant period of time," whereas the

program being challenged had yet to be implemented. Thus, the Court concluded that "there are

no programs or practices 'actually used' in California schools for this court to analyze," and

denied the motion for a injunction. *Id*. at 1020, 1027-28; *see also Carbajal v. Albuquerque

Public School District*, 2000 WL 36740243 at *9 (D.N.M. 2000) (holding that it was "too soon to

determine whether the [challenged program] had adequately assisted [MLL] students in

overcoming their language barriers since a proper evaluation system had not been in place for a sufficient time.").

Here, Plaintiffs' damage claims are based upon pure speculation as to future events. This is not evidence of genuine irreparable harm, it is overblown conjecture.

## IV.  CONCLUSION

For all the above reasons, Defendants' motion for summary judgment should be granted pursuant to Rule 56.

Defendants,
RHODE ISLAND DEPARTMENT OF EDUCATION and ANGÉLICA INFANTE-GREEN, in her official capacity as Commissioner of Education,

By their attorneys,

/s/ A.F. Cottone
/s/ Kaelyn R. Phelps Prigge
_____
Anthony F. Cottone, Esq. (#3922)
Kaelyn R. Phelps Prigge, Esq. (# 10171)
Rhode Island Department of Education
255 Westminster Street, 4th Floor
Providence, Rhode Island 02903
(401) 222-8977
anthony.cottone@ride.ri.gov
kaelyn.phelps@ride.ri.gon

Defendant,
THE PROVIDENCE PUBLIC SCHOOL
DEPARTMENT,

By its attorneys,

/s/ Mary Ann Carroll
/s/ Aubrey Lombardo

_____
Mary Ann Carroll, Esq. (# 6664)
Aubrey Lombardo, Esq (# 7546)
Henneous Carroll Lombardo LLC
155 S. Main Street, Suite 406
Providence, RI 02903
401-424-5224
macarroll@hcllawri.com
alombardo@hcllawri.com

Dated:  April 26, 2024

## CERTIFICATION

I hereby certify that, on this 26th day of April, 2024, I caused this document to be filed with the Court's electronic filing system and served by electronic mail upon Jennifer Wood, Esq. at jwood@centerforjustice.org and John Kawashan, Esq., at jkawashan@centerforjustice.org.  The document electronically filed and served is available for viewing and/or downloading from the Rhode Island Judiciary's Electronic Filing System.

/s/ A.F. Cottone

_____