UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

YSAURA MEZON, individually and as parent      :
of O.M.; LUCIA MEJIA, individually and as      :
parent of E.V.; MARIA PIRIR, individually and as  :
parent of M.P.; JUAN CRUZ ESTEVEZ,        :
individually and as parent of Y.T.; on behalf of   :
themselves and all others similarly situated,     :
                  *Plaintiffs*,      :
                              :

       v.              :          1:24-cv-00161-JJM-LDA
                               :

PROVIDENCE PUBLIC SCHOOL          :
DEPARTMENT; PROVIDENCE PUBLIC        :
SCHOOL BOARD; RHODE ISLAND         :
DEPARTMENT OF EDUCATION; and         :
ANGÉLICA INFANTE-GREEN,           :
Commissioner of Education,            :
                  *Defendants*      :

**THE OBJECTION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF OF
DEFENDANTS RHODE ISLAND DEPARTMENT OF EDUCATION, ITS
COMMISSIONER, AND THE PROVIDENCE PUBLIC SCHOOL DEPARTMENT**

Defendants, RHODE ISLAND DEPARTMENT OF ELEMENTARY AND

SECONDARY EDUCATION ("RIDE"), ANGÉLICA INFANTE-GREEN, in her official

capacity as Commissioner of Education (the "Commissioner"), and the PROVIDENCE PUBLIC

SCHOOL DEPARTMENT ("PPSD" or the "District" and collectively, the "Defendants"), hereby

object to the motion for a temporary restraining order and preliminary injunction filed by

Plaintiffs (ECF 10) pursuant to Federal Rule of Civil Procedure 65.

As grounds, Defendants rely upon: (1) the facts and arguments recited in their

*Memorandum in Support of their Motion for Summary Judgment* ("Defs.' MSJ Mem.") (ECF 8),

which is hereby incorporated by reference; (2) the affidavits of RIDE Deputy Commissioner Dr.

Kelvin Roldán (the "Roldán Aff.") (ECF 8-1) and PPSD Deputy Superintendent of Operations

Zachary Scott (the "Scott Aff.") (ECF 8-15) filed in support of Defendants' motion, which also are hereby incorporated by reference; and (3) the facts and arguments cited herein.

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

360 High School ("360") has been in existence for nine years. *See Plaintiffs' Memorandum in Support of their Motion for Temporary Restraining Order and Preliminary Injunction* ("Pltfs.' PI Mem.") (ECF 10-1) at 7.  After year four, 360 remained in the lowest 5% in student performance in the State, and thus was identified for Comprehensive Support and Improvement ("CSI") pursuant to federal law and Rhode Island's Every Student Succeeds Act ("ESSA") State Plan.  Since that time, 360 has failed to meet the criteria to exit CSI status, and all the relevant data suggests that it will be unlikely to do so when it becomes eligible to exit CSI status in 2024-2025.  As a result, even if PPSD is enjoined from proceeding with its plan to effectively merge 360 with a redesigned Juanita Sanchez Life Sciences Institute ("JSLSI"), it is likely that 360 would nonetheless be *required* to undergo one of five mandated Redesign Models, one of which is closure.  *See* Roldán Aff., ¶¶ 14 at p. 5; *see also* attached Exhibit M (ECF 8-14) at pp. 47-48, 55-56.

Thus, it should not have been surprising that the PPSD Superintendent, the Commissioner and other experts responsible for deciding what is in the best interests of Providence students concluded that the decision to effectively merge  360 with a redesigned JSLSI – not, as Plaintiffs misleadingly and repeatedly suggest, with the currently existing Juanita Sanchez Educational Complex ("JSEC") – was supported by "good cause," as well as by "sound educational theory that was reasonably calculated to achieve the desired educational objectives."  *See id*., ¶ 51 at p. 20.  In addition, it will enable the cash strapped PPSD to save between $1.5 and $2 million in

fiscal year 2025 to re-invest in evidence-based programming for students.  *See* Scott Aff., ¶ 9 at p. 3.

In any event, there is no need for this Court to act as an unelected school board and attempt, in a matter of weeks, to revisit the soundness of the challenged educational policy decision in order to dispose of Plaintiff's motion for injunctive relief since, in addition to Plaintiffs' failure to exhaust available administrative remedies, *see* Defendants' MSJ Mem. at 25-27, Plaintiffs have not and cannot establish irreparable harm, which is an essential element of any claim for injunctive relief.  *See id*. at pp. 36-38 (and discussed further *infra*, at pp. 5-8). Moreover, even if one were to assume, for argument's sake, that Plaintiffs' claim of irreparable harm was supported by more than rank speculation, Plaintiffs' motion for injunctive relief nonetheless should be denied, and Defendants' motion for summary judgment should be granted, as Plaintiffs cannot establish a prima facie case under the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C.A. §§ 1701 *et seq*., as a matter of law.  *See* Defs.' MSJ Mem. at pp. 27-38.

In the seminal EEOA case of *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981), the Circuit Court made clear that:

> The court's responsibility, insofar as educational theory is concerned, is only to ascertain that a school system is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy.

*Id*. at 1009.  Here, it is beyond dispute that the decision to effectively merge 360 with the newly-designed JSLSI was in furtherance of an "educational theory recognized as sound by some experts in the field." *See* Roldán Aff., ¶ 51 at pp. 20.  Therefore, since under the EEOA, "it is not the function of the Courts "to resolve disputes among the competing bodies of expert educational opinion," *see Gomez v. Illinois State Bd. of Educ*., 811 F.2d 1030, 1041 (C.A.7 1987),[1] it simply

---

[1] *See also* cases cited in the Defs.' MSJ Mem. at pp. 33-35.

is irrelevant whether Plaintiffs supplement the arguments of their legal counsel with a contrary expert opinion.  Moreover, to date, Plaintiffs have failed to cite any material evidence to rebut the expert opinion of Deputy Commissioner Roldán, relying, not upon the actual academic performance of students, but rather upon SurveyWorks data, which is nothing more than a sampling of student and parent preferences that is not and cannot be used by RIDE when assessing academic performance.  *See* State ESSA Plan, Roldán Aff., Exhibit M (ECF 8-14) at pp. 23-41.[2]

As to the equities and the public interest, if PPSD is enjoined from accomplishing its plan to merge 360 with a redesigned JSLSI, the loss to the District would not be limited to the anticipated $1.5 to $2 million in cost savings.  Such an order also would create havoc with respect to PPSD's high school redesign plans, not to mention the plans of students and teachers who have already made decisions based upon the anticipated change. *See* Roldán Aff., ¶ 24 at p. 7.

Finally, it is worth repeating that in *Castaneda, supra,* and in every other case applying the EEOA, it has been emphasized that the EEOA confronts courts:

> with a type of task which federal courts are ill-equipped to perform and which we are often criticized for undertaking prescribing substantive standards and policies for institutions whose governance is properly reserved to other levels and branches of our government (i. e., state and local educational agencies) which are better able to assimilate and assess the knowledge of professionals in the field. Confronted, reluctantly, with this type of task in this case, we have attempted to devise a mode of analysis which will permit ourselves and the lower courts to fulfill the responsibility Congress has assigned to us without unduly substituting our educational values and theories for the educational and political decisions reserved to state or local school authorities or the expert knowledge of educators.

648 F.2d at 1009.

---

[2] Defendants mistakenly claimed that the SurveyWorks data cited by Plaintiffs was "undertaken after knowledge of the challenged decision had become the focus of opposition among 360 staff."  Defs.' MSJ Mem. at 28-29.  While true with respect to the SurveyWorks data from 2023-2024, which is in the process of being prepared for public release, the statement is not accurate as to the 2022-2023 data cited by the Plaintiffs.

## II.  ARGUMENT

### 1.  Plaintiffs Cannot Establish Irreparable Harm

As Defendants have noted, it has long been recognized as a fundamental principle that "[i]njunctive relief is appropriate only 'to prevent existing or presently threatened injuries' and 'will not be granted against something merely feared as liable to occur at some indefinite time in the future.'"  *See* Defs.' MSJ Mem. at 36.[3]  The point was made by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008), when the Court rejected the notion that a movant's burden of proof could be satisfied by a showing that irreparable harm was a "possibility," and held that Plaintiffs seeking preliminary relief must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Id*. at 22 (emphasis in original).[4]

Plaintiffs argue that if 360 is closed, "[t]he staff will be scattered, the school disestablished [and] the students marooned[,]" and conclude, without a shred of actual evidence, that Plaintiffs "face the urgent kind of harm found in *Paradise* [*v. Brown Univ*., 2021 WL 6973858 (D.R.I. February 5, 2021)] that calls for the maintenance of the status quo." *See* Pltfs.' PI Mem. at 26.

Of course, if conclusory arguments of legal counsel could support injunctive relief, no school could ever be closed.  In fact, contrary to Plaintiffs' claim that 360 students will be "marooned," they will in fact be treated as any other PPSD high school student with respect to their choice of what high school they want to attend. Indeed, to date, JSLSI has made offers of

---

[3] Citing *Ashland Oil, Inc. v. F.T.C*., 409 F.Supp. 297, 308-09 (D.D.C.1976), aff'd. 548 F.2d 977 (D.C.Cir.1977), quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674, (1930); *see also id*. at 37-38 (discussing *Valeria G. v. Wilson*, 12 F.Supp.2d 1007, 1017–1018 (N.D.Cal.1998) and *Carbajal v. Albuquerque Public School District*, 2000 WL 36740243 at *9 (D.N.M. 2000)).

[4] In *Winter,* the Supreme Court also made clear that: (a) a likelihood of success on the merits; (b) threat of irreparable harm; (c) a balance of equities in favor of the movant; and (d) the public's interest in a preliminary injunction stand on equal footing and each requiring a strong showing for success.  *See* 555 U.S. at 20.

continued employment to 19 teachers at 360, and only 17 students have asked to be assigned to another school.  *See* Roldán Aff., ¶ 24 at p. 7.[5]

Moreover, the facts of *Paradise, supra*, bear slight resemblance to those here.  In that case, this Court, while recognizing that the record was "sparse and contain[ed] only the verified complaint and the emergency motion," granted an emergency temporary restraining order ("TRO"), not a preliminary injunction, in a one and a half-page decision temporarily enjoining Brown University from suspending a student for her failure to follow COVID-19 protocols pending a preliminary injunction hearing.  *See* 2021 WL 6973858 at *1, citing *Bourgoin v. Sebelius,* 928 F.Supp.2d 258, 267 (D.Me. 2013).

In *Bourgoin*, the Court emphasized that ""[a] preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right,'" 928 F.Supp.2d at 267,[6] and *denied* a motion for a TRO brought by a group of disabled adults who, facing the reduction or termination of Medicaid benefits, brought an action challenging the federal approval of Maine's proposed plan amendment tightening the eligibility requirements for Maine's Medicaid program*. See* 928 F. Supp.2d at 259.

Additionally, *Issa v. School District of Lancaster*, 847 F.3d 121 (3rd. Cir. 2017), a case Plaintiffs have cited repeatedly, *see* Plfts. PI Mem. at 3, 12, 14, 16, 19, 20, 21, 23, 25, 26, 27, 30, 31 and 32, does not support Plaintiffs' claim of irreparable harm, nor for that matter, their theory of the case.  In *Issa*, the plaintiffs, refugee students with limited or interrupted formal education who were also facing language barriers, moved for a preliminary injunction to compel the

---

[5] There was one appeal of the recent PPSD administrator non-renewals and that was from 360's Principal, who will be afforded a prompt evidentiary hearing pursuant to the School Administrators' Rights Act, R.I. Gen. Laws § 16-12.1-3.

[6] Quoting *Peoples Federal Savings Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir.2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc*., 645 F.3d 26, 32 (1st Cir.2011)).

defendant, a public school district, to enable them to attend a private school different from the private school that the defendant School District had contracted for them to attend. *See id.* at 135. Significantly, in *Issa*, plaintiffs had an expert who "testified consistently and at length" that the "accelerated, non-sheltered program for ELLs" at the school where plaintiffs were enrolled was "unsound" for students with limited or interrupted formal education. *See Issa, supra*, 847 F.3d at 135.

Thus, the facts in *Issa* are precisely the opposite of those here, where it is the District that is urging that a change is necessary, and it is the Plaintiffs who are suing to maintain the status quo. None of the EEOA cases cited by Plaintiffs suggest that a showing of irreparable harm can be made by engaging in guesswork as to the impact of attending schools with newly-designed programs that have yet to be implemented, which here would involve speculating as to whether attending the newly-designed JSLSI, or some other redesigned high school within the PPSD, would improve student performance. In fact, all of the EEOA cases cited by Plaintiffs involved a challenge to an *existing* program or practice.[7]

      **a.**    **Plaintiffs' reliance on studies of school closings elsewhere is misplaced.**

Plaintiffs' claim of irreparable harm boils down to a reliance upon various studies that have concluded that in some cases, in some places, school closures can have a negative impact

---

[7] *See Castaneda v. Pickard*, 648 F.2d 989, 992 (5th Cir. 1981) (alleging that "the school district unlawfully discriminated against them by using an ability grouping system for classroom assignments which was based on racially and ethnically discriminatory criteria and resulted in impermissible classroom segregation, by discriminating against Mexican-Americans in the hiring and promotion of faculty and administrators, and by failing to implement adequate bilingual education to overcome the linguistic barriers that impede the plaintiffs' equal participation in the educational program of the district"); *Gomez v. Illinois State Bd. of Education*, 811 F.2d 1030, 1037 (7th Cir. 1987) (alleging that state Board of Education and School District Superintendent violated both federal and state law by failing to promulgate uniform and consistent guidelines for the identification, placement, and training of limited English proficiency ("LEP") children); *Daniel [a/k/a Leslie] v. Bd. of Educ. for Ill. Sch. Dist. U-46*, 379 F. Supp. 2d 952, (N.D. Ill. 2005) ( "[i]n addition to shouldering unequal transportation burdens and suffering from school assignment instability, plaintiffs allege that LEP students receive deficient and discriminatory services"); and *Flores v. Arizona*, 48 F. Supp. 2d 937, 956 (D. Ariz. 1999) ("disparate impact claim that the State's school system affords children attending schools in predominantly minority districts less educational benefits and opportunities then students who attend predominantly anglo-schools").

on students.  *See* Pltfs. PI Mem. at 26-30, citing Molly F. Gordon et al., *School Closings in Chicago: Staff and Student Experiences and Academic Outcomes*, 1, 5 (2018) and Matthew F. Larsen, *Does Closing Schools Close Doors? The Effect of High School Closings on Achievement and Attainment*, 76 Econ. Edu. Rev. (2020).

Defendants are acutely aware that, as one commentator has noted, public school closures "disrupt," "destabilize," and "devastate" urban communities."  Nicole Steele Garnett, *Disparate Impact, School Closures and Parental Choice*, 2014 U.Chi.Legal Forum 289, 316 (2014). That same commentator added that:

> . . . there are at least three plausible reasons why closing public schools might have negative consequences for an urban neighborhood. First, when public school *buildings remain vacant* following closures, they may introduce additional physical blight into a community. Second, the decision to close a public school may be interpreted as a *signal that a community is no longer worthy of investment*, leaving residents feeling demoralized and abandoned by public education authorities. Third, school closures may *eliminate important community institutions* in urban neighborhoods.

*Id.* at 316-317 (2014) (emphasis added).

Here, however, none of the three plausible reasons why closing public schools might have negative consequences for an urban neighborhood are applicable as no school building will be closing.  As has been noted, 360 and JSEC are currently co-located within a single building, which JSLSI will occupy pursuant to a redesign of several PPSD high schools that was created with input from a team consisting of students, teachers, administrators, and community members. *See* Roldán Aff., ¶¶ 16-17, 40-50 at 6, 17-20.  Thus, this is unlike most school building closure cases and the studies relied upon by Plaintiffs are simply not relevant.

In addition, as noted by Garnett:

> Federal and state education laws have come to encourage, and in some cases require, the closure of persistently failing schools. Importantly, funding provisions of the controversial No Child Left Behind Act ('NCLB') require districts to divide

> their schools into four academic 'tiers' and condition federal funding on the implementation of one of four intervention methods in the lowest performing schools, three of which might arguably be categorized as 'closing' the school . . . a number of states and school districts independently have adopted accountability measures that include the closure of persistently failing schools and/or their conversion to charter schools.

*Id.* at 301, 303-304 (2014). And as noted, 360 will soon be subject to implementation of one of five mandatory Redesign Models pursuant to federal law and the State ESSER Plan. *See supra* at p. 2.

> **2.** **Plaintiff have basically ignored the evidence that the decision to merge 360 was supported by "good cause" and a sound educational theory reasonably calculated to achieve the desired educational objectives.**

The First Circuit recently reiterated that in evaluating a motion for injunctive relief, "'the movant's likelihood of success on the merits is the 'main bearing wall' of our analysis.'" *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024), quoting *W Holding Co. v. AIG Ins. Co. - Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014). Yet, in support of their motion for injunctive relief, Plaintiffs have essentially repeated the bald claims in their Complaint, the legal insufficiency of which was addressed by Defendants in connection with their pending motion for summary judgment, and need not be repeated here.

> **3.** **The public interest does not support granting the extraordinary relief being requested.**

In *Winters, supra*, the Supreme Court noted that "'courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." 555 U.S. at 24.[8] Here, as noted, granting the requested injunction will not only result in the loss of $1.5 to $2 million in cost savings, it will result in significant additional monetary and other

---

[8] Citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982) and *Railroad Comm'n of Tex. v. Pullman Co*., 312 U.S. 496, 500 (1941);

damage as the District scrambles to adjust the schedules of the many teachers, and hundreds of students, whose expectations as to where they will be working, or attending, school, will be upended.[9]

### III. CONCLUSION

For all the above reasons, Defendants' motion for a temporary restraining order and preliminary injunction should be denied and summary judgment should enter in Defendants' favor as to all claims pursuant to Rule 56.

Defendants,
RHODE ISLAND DEPARTMENT OF
EDUCATION and ANGÉLICA INFANTE-
GREEN, in her official capacity as
Commissioner of Education,
By their attorneys,

/s/ A.F. Cottone
/s/ Kaelyn R. Phelps Prigge
_____
Anthony F. Cottone, Esq. (#3922)
Kaelyn R. Phelps Prigge, Esq. (# 10171)
Rhode Island Department of Education
255 Westminster Street
Providence, Rhode Island 02903
(401) 222-8977
anthony.cottone@ride.ri.gov
kaelyn.phelps@ride.ri.gov

---

[9] If necessary, the extent of this additional monetary damage will be the subject of a supplemental affidavit from PPSD Deputy Superintendent of Operations Zachary Scott.

10

Defendant,
THE PROVIDENCE PUBLIC SCHOOL
DEPARTMENT,
By its attorneys,

/s/ Mary Ann Carroll
/s/ Aubrey Lombard
_____
Mary Ann Carroll, Esq. (# 6664)
Aubrey Lombardo, Esq (# 7546)
Henneous Carroll Lombardo LLC
155 S. Main Street, Suite 406
Providence, RI 02903
401-424-5224
macarroll@hcllawri.com
alombardo@hcllawri.com

## **<u>CERTIFICATION</u>**

I hereby certify that, on this 13th day of May, 2024, I caused this document to be filed with the Court's electronic filing system and served by electronic mail upon Jennifer Wood, Esq. at jwood@centerforjustice.org and John Kawashan, Esq., at jkarwashan@centerforjustice.org. The document electronically filed and served is available for viewing and/or downloading from the Rhode Island Judiciary's Electronic Filing System.

/s/ A.F. Cottone
_____